**STATE of Missouri, Respondent,**

v.

**Raymond MOSLEY, Appellant.**

**No. 51464.**

Supreme Court of Missouri,
Division No. 1.

June 12, 1967.

Norman H. Anderson, Atty. Gen., Jefferson City, Albert J. Stephan, Jr., Sp. Asst. Atty. Gen., St. Louis, for respondent.

Morris M. Hatchett, St. Louis, for appellant.

WELBORN, Commissioner.

Raymond Mosley appeals from a judgment and sentence, imposing a 40-year term of imprisonment, entered, under the Habitual Criminal Act, upon a jury's verdict of guilt of murder in the second degree.

The state's evidence showed the following version of the events involved in this case:

The victim of the homicide, Elijah Frieson, was a resident of Chicago. He and three brothers or stepbrothers had driven to St. Louis in Elijah's automobile and had taken a 12-year-old stepsister to the residence of Elijah's stepfather, Fred E. Franks, Sr. They arrived at the Franks residence at approximately 2:00 A.M., August 23, 1964. The four men left the residence at 3100 North Market Street to go to a tavern at 1812 North Grand, operated by a stepsister. Elijah's automobile, in which the group had traveled from Chicago, was left parked in front of 3100 North Market.

At the tavern, the men met three women, previously unknown to them. Because the tavern was required to close at 2:30, the women and some of the men decided to go to East St. Louis. The group was walking back to Elijah's automobile. At 3103 North Market Street, Miss Gloria Jean Dickerson was seated on the front steps of her residence. Miss Dickerson recognized one of the women in the group, Mary Higgins, and called to her. Miss Higgins and Elijah crossed the street and the two women engaged in a good-natured conversation about Miss Dickerson's pregnancy. Elijah did not know Miss Dickerson and, according to Miss Higgins who testified as a state's witness, Elijah did not talk to Miss Dickerson.

After a brief visit, Miss Higgins and Elijah went across the street to Elijah's automobile and the rest of the group. At about the time they got into the automobile, the defendant, Raymond Mosley, appeared and said to Elijah: "Man, don't you ever say anything to my old lady." Elijah, according to the state's witnesses, replied: "If I said anything to your lady, I'm sorry." Mosley replied: "Well, you better make sure you didn't. If you did, I'll blow your brains out."

Elijah got out of the automobile and Mosley struck him, knocking his glasses off. Mosley then produced a gun and several of the group ran to the front door of the Franks residence. Mosley pointed the gun at one of Elijah's stepbrothers and snapped it. He then fired three shots at the persons in the Franks doorway and Elijah was struck in the chest by a .45 caliber bullet which caused his death.

Gloria Jean Dickerson and the defendant were the only defense witnesses. Miss Dickerson, who admitted that the defendant was her "boy friend" and the father of the child with whom she was pregnant, testified that, when Miss Higgins and Elijah crossed the street to visit with her, she and Miss Higgins engaged in a friendly conversation but that Elijah demanded to know why she was sitting on the front steps at that hour of the night. According to the witness, Elijah began to curse her and said that no decent woman would be on the front steps at that hour of the night. Miss Higgins returned to the Frieson automobile, but, according to the witness, Elijah remained and continued to curse her.

The defendant came around the corner and asked what was going on. Elijah started cursing the defendant and ran across the street to his car. The witness said that Elijah ran across the street to his car, stuck his hand in the window and ran to the back end of the car and then into the doorway. Raymond crossed the street after Elijah ran into the doorway and ran up the steps. Then the defendant fell back down and rolled over on the ground. The witness said that she heard some shots fired but that she never saw a weapon in the hands of either Raymond or Elijah.

The defendant's version of the affair was as follows: He had gone for some shrimp and when he returned, "I heard this particular fellow cursing and talking to her, and then I had the food still in my hand, and I set the food down. I first, I asked 'what did you do to him?' She said, 'I didn't do nothing. I don't even know

him.' I said to him, I said, 'you are wrong; she don't know you.' He said, 'what do you know about it? I'm talking to her.' Calling her all nasty names I wouldn't say in front of ladies. He called her all kind of nasty names. He said—I forgot what time it was, but he said, 'if you seen her on the front this time of morning, you up to no good. You are just like the other three I found in the tavern.' I told him he was wrong that was no proper way to talk to any lady, and if I was talking to his sister, what would he do, you know, and so he said, 'I don't know what's wrong with you. I want some trouble anyway.' He said, 'I haven't had any trouble since I have been in town.' I sat down and finished talking to her, and he went back across the street. When he went back across the street, he reached over in the car. When he turned around, I saw him come out of the car, that's when I ran over toward the car. He had the pistol in the hands when he came out. We were struggling for the pistol. The pistol shot up in the air first time, and then from around me, another man coming from around me— I didn't know him either—he come around and I managed to knock the pistol on the ground, and me and the man got on the ground and struggled for the pistol, and the pistol shot again, and then that's when everybody started running up in the doorway, and that's when I dropped the pistol and I left." The defendant did not testify that either of the shots which were fired during his struggle with the deceased struck the victim. The defendant said that he saw no wound on the deceased. He also said that he "would not know" whether he heard more than two shots.

■ There can be no doubt that the state's evidence would authorize a finding of the appellant guilty of murder in the second degree. Appellant's contention that proof of the essential element of malice was lacking is without merit. Malice, as an element of murder in the second degree, is "the intentional doing of a wrongful act without just cause or excuse" and does not mean spite or ill will. State v. Anderson,

Mo.Sup., 375 S.W.2d 116, 119 [2, 3]; State v. Williams, Mo.Sup., 323 S.W.2d 811, 813 [5–8]. The state's evidence showed that the defendant intentionally killed the deceased with a deadly weapon. Such evidence is sufficient to support a conviction for murder in the second degree. State v. Williams, supra; State v. Thomas, Mo.Sup., 309 S.W.2d 607, 609 [3–5]; State v. Hogan, 352 Mo. 379, 177 S.W.2d 465 [1, 2].

Appellant contends that the trial court erred in failing to instruct on manslaughter and excusable or justifiable homicide, stating that the evidence supported the giving of such instructions.

The allegations of appellant's motion for new trial upon which these assignments are based are:

"2. The Court erred in failing to instruct the jury on points of law properly raised by the evidence in that the Court failed to instruct the jury as to manslaughter which was fairly raised by the evidence, as required by Supreme Court Rule 26.02 (6).

"3. The Court erred in failing to instruct the jury on points of law properly raised by the evidence in that the Court failed to instruct on justifiable or excusable homicide each of which was raised by the testimony of the defendant, as required by Supreme Court Rule 26.02 (6)."

The assignments of error state no facts or theory upon which these instructions should have been given. In the recent case of State v. Cheek, 413 S.W.2d 231, 238 [17], the court stated:

■ "Supreme Court Rule 27.20(a) provides that a motion for new trial 'must set forth in detail and with particularity, in separate numbered paragraphs, the specific grounds or causes therefor.' In discussing that rule we recently said: 'Among other assignments in the motion for a new trial is the contention that the court erred in refusing to instruct on manslaughter; that such an instruction was requested and

refused and that the facts in the case warranted such an instruction. We think this assignment wholly insufficient, under the facts of this case, to comply with Supreme Court Rule 27.20 in that it does not set forth in detail and with particularity the specific grounds or cause therefor, in that it does not indicate in any manner what facts in evidence were considered sufficient to warrant such an instruction.' State v. Luttrell, Mo.Sup., 366 S.W.2d 453, 459. To like effect, see also State v. Burnett, 365 Mo. 1060, 293 S.W.2d 335 [15], State v. Kukovich, Mo.Sup., 380 S.W.2d 324 [10], State v. Sprout, Mo.Sup., 365 S.W.2d 572 [9], State v. Pope, Mo. Sup., 364 S.W.2d 564 [2], and State v. Benjamin, Mo.Sup., 309 S.W.2d 602 [8]. As we have indicated, defendant in the case before us, has completely failed to specify any *facts* in evidence which would have supported a submission of manslaughter by culpable negligence. In that situation we rule that this assignment wholly fails to comply with S.Ct. Rule 27.20(a) and hence does not preserve anything for review."

 The same conclusion is here applicable. Moreover, we do not find that the defendant's evidence required instruction on either manslaughter or justifiable or excusable homicide. Miss Dickerson's testimony would at most show verbal provocation. Such provocation is not sufficient to reduce the otherwise proven offense of second degree murder. State v. Parker, 358 Mo. 262, 214 S.W.2d 25, 27 [5, 6]; State v. Robinson, 353 Mo. 934, 185 S.W.2d 636, 639 [5]; State v. Ferguson, 353 Mo. 46, 182 S.W.2d 38, 40 [2–4].

The appellant's own testimony does not relate his activity to the fatal wound inflicted upon the deceased. No mention is made of either of the shots which defendant said were fired while he and the deceased struggled striking the deceased. In fact, the defendant said that he saw no wound on the victim. The state's evidence, which the defendant did not contradict was that the deceased was shot while in the doorway, not in the street. If the two shots about which appellant testified were the only shots fired, the reasonable assumption could be that the second inflicted the fatal injury. However, appellant stated that he "wouldn't know" whether he heard more than two shots and Miss Dickerson said that she heard "about two" shots. The defendant's version simply would exculpate himself completely from any connection with the death of the deceased and therefore could afford no basis for an instruction on either manslaughter or justifiable or excusable homicide.

The matters of record, examined pursuant to Criminal Rule 28.02, V.A.M.R., are without error.

The judgment is affirmed.

HOUSER, C., dissents.

HIGGINS, C., concurs.

PER CURIAM:

The foregoing opinion by WELBORN, C., is adopted as the opinion of the Court.

HOLMAN, P. J., and HENLEY, J., concur.

SEILER, J., dissents and adopts as his dissenting opinion Memorandum of HOUSER, C.

MEMORANDUM OF DISSENT

HOUSER, Commissioner (dissenting).

As I understand *defendant's* version of the facts the victim, after quarreling with defendant and stating that he was looking for trouble, crossed the street, reached into his automobile and came out of it with a pistol in his hand. Defendant, who in the meantime had run towards the automobile, struggled with the victim for the possession of the pistol. One shot was discharged

into the air. Defendant managed to knock the pistol to the ground. Defendant then engaged in a struggle for the pistol with a third man, who "came from around" defendant. The two men "got on the ground" in their struggle, and the pistol was discharged a second time. "Everybody" started running up into the doorway. According to the state's evidence, the victim was struck by the bullet while in the doorway. Defendant said that he dropped the pistol and left.

Defendant did not categorically deny that he pulled the trigger nor did he testify that he did not intend to shoot the deceased. It seems to me, however, that the plain inference to be drawn from the foregoing is that the victim was shot while standing in the doorway as a result of an unintentional and accidental discharge of the pistol occurring while defendant and the third man were on the ground, scuffling with each other for possession of the pistol.

As I have always understood the law, when a gun is discharged while defendant and the victim are scuffling or struggling for its possession, and death results, the court is obliged to instruct on the issue of excusable homicide. I see no substantial difference between the facts in this case and those in State v. Haygood, Mo.Sup., 411 S.W.2d 230. There defendant and the victim had words concerning a reconciliation. The victim came at defendant with a knife, stabbed him, and the parties started grappling. Defendant picked up a pistol off a table. While they were scuffling and as defendant was trying to transfer the gun from his right to his left hand he was again stabbed and the gun went off and shot into the ceiling. While defendant was holding the victim's hand in which she held the knife the gun went off again, shooting the victim. Defendant at that time did not know that the victim was shot. On February 13, 1967 Division 2 held that under these circumstances it was plain error not to instruct on the issue of excusable homicide.

Other cases involving homicide as a result of scuffling for a gun, in which it was held that an instruction on excusable homicide was proper or necessary, are State v. O'Kelley, Mo.Sup., 213 S.W.2d 963 and State v. Hale, Mo.Sup., 371 S.W.2d 249. See also State v. Baker, Mo.Sup., 277 S. W.2d 627.

The proposed opinion suggests that defendant's testimony does not relate his activity to the infliction of the fatal wound; that there is no testimony that either of the shots struck the victim. This seems to me to be an overrefinement in reasoning. It is apparent to me that there is circumstantial evidence of the fact that the second shot inflicted the fatal wound; that this is the plain inference to be drawn from defendant's testimony. I cannot concur in an opinion which if adopted will affirm a conviction which carries a 40-year punishment, on such a hypertechnical basis, especially in view of the fact that only three months ago, under strikingly similar facts, this Court reversed a conviction of second degree murder on the ground that the failure to instruct on excusable homicide constitutes plain error.

I recognize that under State v. Cheek, et al., the assignment of error in defendant's motion for new trial did not sufficiently raise the point that the court erred in not instructing on manslaughter, under previously decided cases requiring the supporting facts to be alleged in the motion.

Notwithstanding the point was not sufficiently developed in the assignment of error in the motion for new trial I believe that the judgment should be reversed and the cause remanded under the plain error rule. State v. Haygood, Mo.Sup., 411 S. W.2d 230, found good reason to invoke that rule in that case, and I cannot see any substantial difference in these two cases, as previously indicated. In Haygood Division 2 said, 411 S.W.2d, l. c. 232:

"We conclude that under the circumstances of this case the failure of the trial

court to instruct the jury on defendant's defense that the homicide was accidental was plain error under Criminal Rule 27.20(c). See State v. Reeder, Mo., 395 S.W.2d 209, 211."